**Carpenter Trust**

*Brubaker & Brubaker*, for accountant.

*Barley, Snyder, Cooper & Mueller* and *Zimmerman & Going*, for hospitals.

*Louis Weisman*, for Commonwealth.

APPEL, J., May 25, 1972.—Samuel L. Carpenter died February 27, 1930, having disposed of his estate by will dated January 11, 1928, and by codicils dated March 21, 1929, May 20, 1929, and January 7, 1930. Testator bequeathed concurrent and successive life estates among four beneficiaries, the last of whom died July 27, 1970, whereby the following paragraphs disposing of the remainder are pertinent to this adjudication:

"ELEVENTH: In the event that my said grandson, Samuel L. Carpenter Shirk, shall die without leaving any lawful children to survive him, before the death of my said wife, Mary Carpenter, and the death of my said daughter, Stella J. Shirk, or either of them. Then I do order and direct the said Trustee to distribute and divide any and all trust funds and any and all of my said residuary estate, then remaining in its hands, subject, however, to all of the provisions hereinbefore made for my said wife, Mary Carpenter, my said daughter, Stella J. Shirk, and my said son-in-law,

Lemon S. Shirk, into four equal shares or parts, as follows:

"TWELFTH: One equal one-fourth part thereof I give and bequeath to the said The Fulton National Bank, in trust, to invest the same in good and lawful securities and to pay the net, annual income derived therefrom to the Treasurer of the Reformed Mennonite Church of Lancaster County, Pennsylvania, to be used for such purposes as may be directed by the proper authorities of the said Church.

"THIRTEENTH: One equal one-fourth part thereof I give and bequeath to the said The Fulton National Bank, in trust, for the purpose of furnishing, equipping and maintaining a room in the Lancaster General Hospital, of the City of Lancaster aforesaid, to be known as the 'Carpenter Room.' My said Trustee to have full power, in the first instance, to expend any part of the principal or income for the original furnishing and equipment of said room, and in all matters relating to the cost and character of the same, and in all expenditures relative to said room my said Trustee shall have absolute discretion and authority. After the said room shall have been furnished and equipped the said Trustee is to continue to hold and invest the balance of the trust fund in its hands and to pay over to the said Hospital the annual income received therefrom, and said Hospital shall be required to expend said income to maintain the said room and to provide all necessary linens, decorations and all other supplies which may from time to time be required, and, in addition, to keep in good condition all the furnishings and equipment therein contained, and to restore or replace any such equipment which may become unfit for use; and, if any income remains at any time in the hands of the Hospital, after the foregoing conditions have

been complied with, the same may be used for the general purposes of the Hospital.

"FOURTEENTH: One equal one-fourth part thereof I give and bequeath to the said The Fulton National Bank, in trust, for the purpose of furnishing, equipping and maintaining a room in the St. Joseph's Hospital, of the City of Lancaster aforesaid, to be known as the 'Carpenter Room.' My said Trustee to have full power, in the first instance, to expend any part of the principal or income for the original furnishing and equipment of said room, and in all expenditures relative to said room my said Trustee shall have absolute discretion and authority. After the said room shall have been furnished and equipped the said Trustee is to continue to hold and invest the balance of the trust fund in its hands and to pay over to the said Hospital the annual income received therefrom, and said Hospital shall be required to expend said income to maintain the said room and to provide all necessary linens, decorations and all other supplies which may from time to time be required, and, in addition, to keep in good condition all the furnishings and equipment therein contained, and to restore or replace any such equipment which may become unfit for use; and, if any income remains at any time in the hands of the Hospital after the foregoing conditions have been complied with, the same may be used for the general purposes of the Hospital.

"FIFTEENTH: One equal one-fourth part thereof I give and bequeath to the said The Fulton National Bank, in trust, to invest the same in good and lawful securities, and to pay the net, annual income derived therefrom to the Lancaster Community Service Association, of the City of Lancaster aforesaid, said income to be used and applied by said Lancaster Community Service Association for the general purposes thereof,

706

or, if at any time the said income can be used for any special purposes, the Board of Trustees or Managers of said Association shall be at liberty to apply the same for such special object or purpose.

"SIXTEENTH: If at any time the said Reformed Mennonite Church, or the said Lancaster General Hospital, or the said St. Joseph's Hospital, or the said Lancaster Community Service Association, become dissolved and go out of existence, then any trust funds in the hands of my said Trustee, under Items, Eleventh, Twelfth, Thirteenth and Fourteenth and Fifteenth of this my will shall be held by the said Trustee for the use and benefit of the surviving organizations."

Each of the organizations is in existence. The Lancaster Community Service Association is now Family and Children's Service of Lancaster County by amended articles of incorporation approved by the Court of Common Pleas of Lancaster County dated April 29, 1949. The Fulton National Bank is now the Fulton National Bank of Lancaster.

## LEGACIES TO HOSPITALS

The Lancaster General Hospital, beneficiary under paragraph Thirteenth, and St. Joseph's Hospital, beneficiary under paragraph Fourteenth, have each presented a petition on which testimony has been presented to the court. The petitions are similar and as to each suggest that the provisions of the will provide conditions which "would impose on petitioner an extremely heavy if not impossible burden."

Each hospital accepts the legacy. Each hospital states that it has a "presently existing and presently furnished and equipped room for the care of patients," with identification thereof by a suitable plaque. To this point there is no problem. The will directs furnishing, equipping and maintaining "a room" in each of the hospitals. That each hospital proposes to use a

presently existing, furnished and equipped room is, in our opinion, an adequate compliance with that aspect of the provision of the will. The testimony suggests that the furnishing and equipping of a hospital room is an ever present repetitive process. We cannot distort testator's words to require that a new room be used or that it be newly furnished or equipped.

Each hospital asserts that it is impossible to determine with accuracy the cost of providing linens, decorations and other supplies for any given room. It, therefore, requests that the award be made to pay the income to the hospital "so long as it shall maintain a room in said hospital for the care of patients, known as the 'Carpenter Room,' identified by a suitable plaque stating that it is the 'Carpenter Room' and that it is furnished, equipped and maintained by funds supplied by Samuel L. Carpenter; and so long as said room is furnished, equipped and maintained for the proper care of patients therein."

We believe it was testator's intention to provide a room in each hospital. We can find no requirement that the costs thereof be recorded separately. In our opinion, the only requirement is that there be a room. The fact that the hospital is entitled to income in excess thereof to be used for the general purposes of the hospital makes it unnecessary to establish the identity and source of each cent used in connection with the room designated as long as sufficient cents and dollars are used to provide those things specified for the room.

We conclude that the language suggested is consistent with the intention of testator as stated in the will and, therefore, will award as requested.

## COMPENSATION OF TRUSTEE

This is the second account of the trustee. The ac-

countant has charged itself with assets awarded to it "as per Adjudication filed July 18, 1957," the value of which is $251,038.64. The addition of profit from conversion of assets and adjustment of discount produced total principal debits of $266,588.01. The account contains a credit for payment to the Fulton National Bank of Lancaster, accountant's compensation, $13,329. The compensation was obviously computed at five percent. The accountant had been one of the executors of decedent's will. Since decedent had died prior to the adoption of the Act of April 10, 1945, P. L. 189, it is necessary that the court sua sponte inquire into the question of the accountant's entitlement to the compensation for which credit has been taken.

Section 45 of the Fiduciaries Act of June 7, 1917, P. L. 447, sec. 45, 20 PS §813, provided:

"In all cases where the same person shall, under a will, fulfill the duties of executor and trustee, it shall not be lawful for such person to receive or charge more than one commission upon any sum of money coming into or passing through his hands, or held by him for the benefit of other parties; and such single commission shall be deemed a full compensation for his services in the double capacity of executor and trustee: Provided, That any such trustee shall be allowed to retain a reasonable commission on the income he may receive from any estate held by him in trust as aforesaid."

In Scott Estate, 418 Pa. 332 (1965), the Supreme Court discussed the effect of the repeal of the above section 45 by the Act of April 10, 1945, P. L. 189. Then Chief Justice Bell said, at page 337:

"Irrespective of whether this part of the Williamson Estate Opinion was or was not dictum, we find it persuasive and applicable. It is clear as crystal that the corporate trustee in that case, as in this case, ac-

cepted a commission at the termination of the executorship which the applicable Act of 1917, in the clearest imaginable language stated was to be 'a full compensation [on principal] for his services in the double capacity of executor and trustee' and that this provision was to apply in all cases where the same person fulfilled the duties of executor and testamentary trustee. To now allow the Act of 1945 to abrogate and nullify what the corporate trustee with its eyes open, had been paid and had accepted in 1941 as full compensation on principal for all its ordinary services in its dual capacity of executor and trustee would be to make a mockery of the law and of the rights of all parties, beneficiaries and fiduciaries alike. This we are unwilling to do."

An analysis of the three accounts filed by the personal representatives, of which the present accountant was one, establishes that compensation on principal sums was paid to the accountants at five percent. The total debits on which compensation was apparently based was $293,083.91 and the compensation was $14,654.19.

We note that the Fulton National Bank was trustee under the will of this decedent for the use of Daniel F. McCloud. That trust terminated with the death of McCloud in 1943. The trustee there did not receive compensation. Although that was prior to the Act of April 10, 1945, the failure to claim compensation at that time is indicative that the accountant then knew, "that the Statute (Act of 1917) clearly and unambiguously fixed the present and future rights of all executors-trustees to a single commission on principal, which such fiduciaries received and agreed to accept as full compensation for their combined executor and trustee fiduciary services, past, present and future": Scott Estate, supra, page 339.

With some reluctance we conclude that we are required to surcharge the accountant $13,329, being the sum of the compensation credited in the personal estate principal account. Our reluctance stems from realization that the bulk of the assets in the hands of the trustee have been administered by it for approximately 40 years. On the other hand our reluctance may be lessened by recognition that the only aspect of this trust which differs from many trusts being administered for the benefit of charitable organizations under the strictures of the Act of June 7, 1917, is that in this estate there were prior life estates which terminated and made requisite the filing of an account.

Our investigation suggests that the accountant has not previously received any compensation based on the principal realty included in the account whereby the credit for compensation in the real estate principal account is allowed.

## INHERITANCE TAX

The Commonwealth of Pennsylvania has claimed inheritance tax in the sum of $26,342.33 based on 10 percent of $263,423.27, being the difference between a remainder appraisal of assets valued at $268,926.88 less debts and deductions stated in the account totalling $5,503.61.

The charitable organizations which are the beneficiaries of income from the trusts to be awarded herein have objected to the tax. It has been asserted that the legacies fall within the charitable exemption Act of May 28, 1956, P. L. (1955) 1757, as amended, 72 PS §2301.1, and, also, that the Commonwealth had lost its claim because of its failure to reserve the right.

A search of the records establishes that throughout the administration of the estate and the trust, the taxes

paid at the time of accountings were on life estates. The notes of audit contain statements that the "remainder is still open" and that "the adjustment of the balance of transfer inheritance tax due the estate be left to a future accounting." It may be that there has been an informality of practice; however, a reservation is implicit in the facts. We, therefore, see no merit in the second argument and address the question of the effect of the charitable exemption act.

It is our understanding that since the estates bequeathed to the charitable organizations were dependent upon the death of an individual without issue, they are contingent remainders. The Commonwealth asserts that the interests having come into being upon the death of the testator on February 27, 1930, the taxability thereof is unaffected by the act pertaining to charitable exemptions.

Neither counsel nor our research has produced an appellate court determination of the question. The situation is somewhere between that of Tracy Estate, 403 Pa. 373 (1961), which involved a vested remainder, and Moore Estate, 445 Pa. 17 (1971), in which a power of appointment was considered.

In Tracy, the testatrix died in 1947. She bequeathed income to sisters until the death of the survivor, when the corpus was to be distributed to certain named charities. The surviving sister died December 1, 1958. The court held that the exemption statute was not applicable.

In Moore, supra, the testator died in 1954. He gave a part of the residuary estate to trustees with income to wife for life and at her death to distribute the principal to such parties as she might appoint by her will. The spouse died in 1965, having properly appointed for the benefit of two charitable organizations conceded to be statutorily exempt. The Commonwealth argued

that the exemption was not available because the power of appointment was created prior to the effective date of the exemption statute.

Mr. Justice Roberts, in disposing of the Commonwealth's argument, said, at page 20:

"In assessing these competing arguments, it is important to bear in mind that this appeal poses a single, albeit important issue of statutory construction, to wit: when did the 'transfer . . . to' the appointees take place. In answering this question we must of course be guided by the text of the charitable exemption statute and by a consideration of the public policies which it seeks to foster."

The answer to the question of when the transfer occurred is set forth in the following:

"With this in mind, we find appellants' position persuasive. When the power of appointment was created in 1954, the eventual appointees had no interest whatsoever in the trust, either present or future, vested or contingent, cf. Tracy Estate, 403 Pa. 373, 170 A. 2d 93 (1961), and they did not obtain any legal or equitable interest in the trust until the power's exercise upon Edith Moore's death in 1965. To hold that there was a 'transfer . . . to' the appointees prior to the passage and effective date of the charitable exemption statute would be to ascribe a highly artificial meaning to the statute in the absence of any apparent legislative intent that we do so. We therefore conclude to the contrary that there was no statutory 'transfer . . . to' the appointees until the date of the exercise of the power."

The court then found that the legislative purpose "of encouragement to charities and charitable giving in the public interest" would be frustrated to a significant degree if the charitable exemption were not held applicable to powers of appointment created prior to but exercised after the effective date of the Act. "[T]here

would have been no tax incentive for her and others in similar positions to appoint charitable institutions. We cannot conclude that the Legislature did not intend to tap this large reservoir of potential philanthropy": 445 Pa. at page 22.

In the present case, the existence or nonexistence of the reservoir of potential philanthropy is dependent upon whether an individual has issue or doesn't have issue. We are aware of numerous methods for the limitation of issue and that a myriad of considerations are the prelude to the use of such methods. However, we are unable to conceive that the fulfillment or nonfulfillment of a gift to a charitable organization would be one of the considerations of the person within whose power the matter has been reposed. We, therefore, conclude that the legislative purpose so aptly applied to the exercise of a power of appointment is not frustrated significantly by a determination that the charitable exemption is not applicable in the case of a contingent remainder established prior to the act. The incentive to give is unrelated to the incentive to procreate.

This then brings us again to the question of when the transfer occurred. We believe that this was answered correctly by President Judge Kohler, of the Orphans' Court of York County, in Kerr Estate, 26 D. & C. 2d 131, wherein, after a full analysis of the Act of 1919 and related cases, he concluded as follows:

"We construe the Act of 1919, supra, and especially section 1(d) thereof heretofore quoted in part, to vest in the commonwealth, on the death of a testator, the right to tax his testamentary transfers of any future interests, even though 'contingent or defeasibly transferred' by the will. Testator's death is the effective date of the will, and the latter is the instrument which transfers the title. The transfer of the title is the taxing event. When

the transfer of enjoyment is postponed, the right to demand payment of the tax is likewise postponed until the interest vests in possession."

Further, in paraphrase, we conclude that the Commonwealth's right to impose a transfer inheritance tax upon the bequests to charitable organizations in the will of Samuel L. Carpenter became vested upon his death on February 27, 1930, although the tax might not become due and collectible until the death of Samuel L. Carpenter Shirk in 1970, and that, consequently, the Act of May 28, 1956, as amended, being prospective in operation, did not divest the Commonwealth's right to tax the bequest.